No. 85-367

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

TRI-COUNTY PLUMBING & HEATING, INC.,
a Montana corp., and ATLAS ELECTRIC,
INC., a Montana corp., & INGRAM-CLEVENGER,
INC., a Montana corp., Intervening Plaintiff,

Plaintiffs and Respondents,

-vs-

LEVEE RESTORATIONS, INC., a Montana corp.,
and DEER LODGE BANK & TRUST CO., a corp.,

Defendants and Appellants.

---

APPEAL FROM: District Court of the Twelfth Judicial District,
In and for the County of Choteau,
The Honorable Chan Ettien, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Swanberg, Koby, Swanberg & Matteucci; Gorham Swanberg,
Great Falls, Montana (Levee Restorations)
Jardine, Stephenson, Blewett & Weaver; Greg Luinstra
argued, Great Falls, Montana   (Deer Lodge Bank)

For Respondent:

Hooks & Budewitz; Tom Budewitz argued, Townsend,
Montana
Ronald F. Waterman argued, Helena, Montana

---

Submitted: April 22, 1986

Decided: June 5, 1986

Filed: JUN 5 - 1986

_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff Tri-County Plumbing and Heating, Inc./Atlas Electric, Inc. (hereinafter "Tri-County") brought this action in Chouteau County District Court to foreclose a mechanics' lien filed by them against certain real property located in Fort Benton, Montana, owed by defendant Levee Restorations, Inc. (hereinafter "Levee"). The Deer Lodge Bank and Trust Company (hereinafter "Bank") was also named as a defendant by virtue of its mortgage on the same real property. Ingram-Clevenger, Inc. (hereinafter "Ingram-Clevenger") filed a motion to intervene as a plaintiff in order to foreclose its own mechanic's lien on the same property. The Bank then cross-claimed against Levee to foreclose its mortgage on the subject property.

The matter was heard by the District Court, sitting without a jury, in March of 1985. In June of 1985, the trial court issued its findings of fact, conclusions of law, and decree granting judgment against Levee in favor of Tri-County and Ingram-Clevenger for the amounts requested in their respective mechanic's liens plus interest, attorneys fees and costs. The trial court also awarded judgment against Levee in favor of the Bank for the amount of their mortgage plus interest, attorneys fees, and costs. The trial court further accorded the liens of Tri-County and Ingram-Clevenger equal status and declared them to be superior in priority to the mortgage of the Bank. In addition, the trial court granted lien status to certain items furnished by Tri-County and Ingram-Clevenger which followed the date on which their mechanic's liens were filed. These additional items were supplied by the two plaintiffs for the preservation and protection of the subject property and were awarded a first

- 2 -

priority by the trial court over payment of all other liens and encumbrances. Only the Bank, and not Levee, appeals from this judgment of the trial court. We affirm.

On November 4, 1983, Ingram-Clevenger (a general contractor with its principal place of business in Helena, Montana) entered into several contracts with Levee for the interior restoration, remodeling and renovation of the Grand Union Hotel ("Hotel") located in Fort Benton, Montana. The total contract price for the work to be performed under these contracts was $862,260. Ingram-Clevenger then subcontracted a major portion of the work to Tri-County (a plumbing, heating and electrical contractor with his principal place of business in Helena, Montana) for the performance of the plumbing, heating and electrical work on the Hotel.

On February 6, 1984, Levee obtained a loan from the Bank in the amount of $210,000. The majority of this loan ($179,500) was applied by Levee to the Hotel renovation project. This loan was secured by two mortgages given by Levee to the Bank, one of which included a mortgage on the Hotel. The other mortgage given by Levee to the Bank was not at issue in this lawsuit. The mortgage on the Hotel was recorded in the Chouteau County Clerk and Recorder's office on February 10, 1984.

Ingram-Clevenger started work on the Hotel project on or about November 4, 1983. From time to time, as required under the construction contracts, Ingram-Clevenger submitted applications for payment to Levee's architect for the project, Richard Shope. Ingram-Clevenger submitted a total of nine applications for payment to Shope, of which only the first four were approved and paid covering the period from November, 1983 through February, 1984. The last five applications for payment (covering March through May, 1984)

were not approved or paid by Shope because Levee had not secured future financing for the Hotel project. After the last payment was made by Levee to Ingram-Clevenger in February of 1984, Ingram-Clevenger continued to work on the project apparently in anticipation of Levee securing future financing. During the late spring of 1984, it became apparent that future financing for the project could not be found and Ingram-Clevenger halted work at the end of May. It appears that the only financing obtained by Levee for the Hotel project was the above mentioned loan from the Bank. To date, Levee has only paid the sum of $145,440 to Ingram-Clevenger under the Hotel project contracts, despite a total of over $600,000 worth of work having been performed by the plaintiffs.

On June 7, 1984, Tri-County filed a mechanic's lien against the Hotel in the amount of $149,829. This sum represented the amount it was owed by Ingram-Clevenger for its unpaid subcontracting work. On July 7, 1984, Ingram-Clevenger filed its own mechanic's lien against the Hotel for the sum of $441,344. This sum was the unpaid portion of the Hotel project contracts at the time the lien was filed, and it was based on the unpaid applications for payment presented to Levee. Both of these liens were properly recorded with the Clerk and Recorder of Chouteau County.

It should be noted that Tri-County's mechanic's lien claim was included in its entirety in Ingram-Clevenger's lien except for the sum of $2,369. This amount represented items which were negotiated directly between Tri-County and Levee, and this sum was included in Tri-County's lien of $149,829.

Following the filing of the mechanic's liens by Tri-County and Ingram-Clevenger, both Ingram-Clevenger and

- 4 -

Tri-County continued to incur expenses relating to the protection and preservation of the Hotel project. These expenses included $10,000 for the installation of a water line, $3,671.99 for insurance premiums, $5,303.91 for gas and electricity, and $629 for repairs due to freezing.

Once it became apparent that no more funds were forthcoming from Levee for the Hotel project, Tri-County filed suit on its mechanic's lien on June 8, 1984, and the above-described proceedings ensued. The District Court granted judgment against Levee in favor of Tri-County and Ingram-Clevenger for the respective amounts of their mechanic's liens, $149,829 and $312,491 (which included a $20,976 mathematical error discovered during trial). Ingram-Clevenger's judgment was later reduced by the trial court to the sum of $300,076 due to the sale of certain construction supplies from the Hotel project. The trial court also accorded equal lien status to the liens of Ingram-Clevenger and Tri-County, and declared the mortgage of the Bank ($210,000) to be second in priority. The trial court further decreed that the "preservation" expenses incurred by Ingram-Clevenger and Tri-County should be accorded a first priority of payment over all other liens and encumbrances.

The Bank now presents the following pertinent issues for review by this Court:

1. Did the District Court err in not granting a continuance of the trial in order that discovery could be initiated and completed?

2. Was there substantial evidence to support the finding of the District Court as to the amount of Ingram-Clevenger's lien and that the lien was not in fact overstated?

- 5 -

3. Did the District Court err in awarding lien status to certain "preservation expenses" incurred subsequent to the filing of Ingram-Clevenger's and Tri-County's mechanic's liens and granting a priority to these expenses superior to that accorded either the mechanic's liens or the Bank's mortgage?

4. Did the District Court err in awarding Ingram-Clevenger an amount in excess of the stated amount of its lien as actually filed with the Clerk and Recorder where no additional or supplemental lien was filed?

5. Did the District Court err in awarding the liens a priority status over that of the Bank's mortgage?

## I.

Did the District Court err in not granting a continuance of the trial in order that discovery could be initiated and completed?

The Bank basically argues the District Court erred in not granting its request for a continuance on the day of trial. The Bank argues it needed the continuance because it was not prepared to adequately cross-examine the lien claimant's witnesses due to an insufficient amount of time to conduct discovery. The Bank points out this case had originally been set for trial in November, 1984. At that time, the parties stipulated to a vacation of that trial date due to pending settlement negotiations. Thereafter, on January 24, 1985, the original counsel for the Bank withdrew from the case and present counsel was substituted. The District Court then set the case for trial on February 26, 1985, which was just over one month after the present counsel for the Bank came into the case. The Bank argues its present counsel immediately filed a motion for a continuance, which was granted, but the trial date was only set back some three

weeks to March 12, 1985. The Bank points out its present counsel had only been appointed for seven weeks when the trial began.

The Bank contends due to the quick trial date of this case after its substitution of new counsel, adequate discovery was not conducted by any of the parties involved. In fact, the Bank argues, no discovery had been initiated by any of the parties until the Bank's present counsel came into the case. Therefore, the Bank argues, it was prevented at trial from properly cross-examining the claimants' witnesses (especially with regard to the amounts of the mechanic's liens), and this Court should grant it a new trial. We disagree.

First, it must be pointed out that any motion for a continuance of trial is within the sound discretion of the District Court. This Court has said it will not overrule a District Court's decision to deny a motion for a continuance of trial unless there is "an affirmative showing that the complaining party has suffered prejudice." State v. Bailey (1935), 99 Mont. 484, 488, 44 P.2d 740, 742. In the present case, there is no showing that the Bank suffered prejudice by proceeding to trial on the scheduled date.

As the claimants point out, the Bank had nine months to do whatever discovery it deemed necessary from the date the suit was filed (June 8, 1984) until the date of trial (March 12, 1985). Admittedly, new counsel was substituted for the Bank on January 24, 1985, but one continuance of the trial was granted for this reason (February 26 to March 12, 1985). Furthermore, once new counsel was substituted for the Bank, they made no effort to do any discovery on their own. The record indicates they made no effort to schedule any depositions or request the production of documents.

Therefore, the District Court did not abuse its discretion in denying the Bank's motion for a continuance made on the day of trial.

## II.

Was there substantial evidence to support the finding of the District Court as to the amount of Ingram-Clevenger's lien and that the lien was not in fact overstated?

The Bank correctly points out that under Montana law a mechanic's lien claimant does not have a right to a lien until he can show or prove his lien.

> The burden is upon the plaintiff to establish his lien (citation omitted), and, to support this burden, he must show, not only that he furnished the materials, but also that they were used for the enhancement of the property to which he claims he has a right to resort as security for the debt thus created. In the absence of this showing, his equity does not arise (citations omitted).

Rogers - Templeton Lumber Co. v. Welch (1919), 56 Mont. 321, 328, 184 P. 838, 841.

The Bank further points out it is clear in Montana that a lien holder is entitled to the reasonable value of its labor and materials furnished.

> The abandonment of an improvement before the completion thereof, by the owner of the premises, without fault on the part of the contractor, does not abrogate the right of the contractor, laborers, and material men to mechanics' liens for the value of the work done and the material furnished. (Citations omitted).

Williams Brothers Construction v. Vaughn (Mont. 1981), 631 P.2d 688, 690, 38 St.Rep. 1070, 1073.

In light of these standards, the Bank argues that Ingram-Clevenger, and therefore Tri-County, have not established the amounts of their liens. The Bank asserts the measure of damages to which the lien claimants are entitled is determined by the value of the materials and labor furnished which, of course, is a matter of proof. The Bank

- 8 -

argues the claimants cannot base the amounts of their liens solely on estimates of the labor and materials they put into the Hotel project. Yet, the Bank argues, that is exactly what the lien claimants have done and that is the basis upon which the District Court awarded them the amounts of their liens.

The Bank contends in the present case the amount of Ingram-Clevenger's lien, which includes Tri-County's lien, was established mainly through the testimony of Joe Petrini, the secretary/treasurer for Ingram-Clevenger. The Bank claims that Petrini testified at trial that he was the person who prepared and submitted the applications for payment to Levee's architect for the Hotel project, Richard Shope. The Bank further claims that Petrini testified that these applications for payment submitted to Levee were not based on the actual amount of materials and labor put into the project, but rather he testified that these applications for payment were based solely on estimates of the labor and materials furnished. The Bank strongly relies on the following testimony from Petrini to establish that Ingram-Clevenger's applications for payment were solely based on estimates:

> Q. (By Ronald Waterman, Ingram-Clevenger's counsel) Mr. Petrini, in the application forms, as an example, the application dated through the period of December 3rd, 1983, would you tell the court, are these commonly prepared by you?
>
> A. (By Petrini) In the course of our business, yes.
>
> Q. And how are these prepared?
>
> A. At the request of an architect, owner. And to eliminate confusion, to try to allow the architect and the owner to reasonably review percentage of completion, we prepared a breakdown. In this case, at the request of the architect prior to submittal, this was

acceptable to him.  And we proceeded on that basis.

Q.  Did you actually develop this application, you, yourself?

A.  Yes.  I did.

Q.  And were these figures drawn from other books and records which are regularly kept within, with Ingram-Clevenger?

A.  Okay.  These figures are developed using our estimated, estimating procedure.  This I funnel all of those estimated costs into a category.  Just to allow everyone to be able to better understand the billing process. (Emphasis added.)

The Bank claims the above testimony, together with other testimony by Petrini, establishes that the figures used on the applications for payment submitted to Levee were based only on estimates of the work completed and were not developed from an actual tally of hours spent on the job or from materials invoiced and installed.  The Bank argues there was no proof presented at trial whatsoever which established a certain dollar figure of the labor and materials actually put into the Hotel project.  Consequently, the Bank argues, because these estimated applications for payment were the basis for the amounts of the claimants' liens, the liens themselves are only estimates and must be disregarded.

Furthermore, the Bank argues, there was also strong evidence presented at trial that Ingram-Clevenger's lien, which includes Tri-County's lien, was in fact overstated. The Bank points to the testimony of Richard Shope (Levee's architect for the project) and Larry Truchot (an architect and independent contractor who testified on behalf of Levee and the Bank) to establish that Ingram-Clevenger's lien was excessive.  The Bank argues both of these men separately evaluated the amount of materials and labor which actually went into the project and compared this amount to the figures

on Ingram-Clevenger's filed lien, and both men concluded that Ingram-Clevenger's lien was excessive. In fact, the Bank asserts, Shope and Truchot testified that Ingram-Clevenger's filed lien should be reduced somewhere between 15 percent and 22 percent. Therefore, the Bank argues, because Ingram-Clevenger's lien appears to be intentionally overstated based on a faulty "estimating procedure," the lien itself should be vitiated (voided). See, Duval v. Fuchs (1962), 141 Mont. 123, 375 P.2d 541. At the very least, the Bank seems to argue, this case should be remanded for a new trial for an accounting of the actual amounts of the claimants' liens. We disagree.

We hold there is substantial evidence in the record to support the award as to the amount of a Ingram-Clevenger's mechanic's lien and that this lien was not in fact overstated. First, the amount of Ingram-Clevenger's lien was not based on estimates as the Bank suggests. Joe Petrini (Ingram-Clevenger's secretary/treasurer), testified thoroughly and completely during trial about the work which had been performed by the claimants on the Hotel project but which remained unpaid. Petrini's testimony was not based on estimates, but rather it was based upon the actual records of labor performed, materials supplied, and subcontract work done. The District Court had before it the summaries of the labor and materials supplied by the claimants (plaintiffs' exhibits A-1 through A-10) and also the primary documents from which these summaries were taken (plaintiffs' exhibits B and C). As Petrini testified with regard to exhibit C:

> Q. (By Mr. Waterman) Handing you what has been marked proposed exhibit C, what is exhibit C?
>
> A. (By Petrini) Exhibit C is a computer prepared job cost information.

THE COURT: What?

A.   Job cost information for all of our projects.

Q.   This is all of your projects that are ongoing?

A.   That's correct.

Q.   Does part of these records contain the job cost information relative to the Grand Union Hotel?

A.   That's correct.

Q.   And is that designated in exhibit C with this white mark?

A.   That's correct.

Q.   And where are those records drawn from?

A.   From actual costs, labor, actual invoices. Subcontract expenses. (Emphasis added.)

Q.   Do these job costs, were these job costs then used in making the calculations to come up with the exhibits A and A-1 through A-10?

A.   That's correct.

As evidenced from the above testimony, we hold Ingram-Clevenger's lien was not based on estimates, but rather it was based upon actual job cost figures. Therefore, there is substantial evidence in the record to support the amounts of the claimants' liens.

We further find that Ingram-Clevenger's lien was not overstated. The testimony of Richard Shope and Larry Truchot, who both testified that Ingram-Clevenger's lien should be reduced by 15 percent to 22 percent, was obviously disregarded by the District Court. We see no reason to disturb that finding by the lower court, especially in light of the overwhelming evidence in the record, as discussed above, that supports the amount of Ingram-Clevenger's filed lien. Therefore, we find the amount of Ingram-Clevenger's lien was not overstated and the award as to the amount of the lien shall stand.

III.

- 12 -

Did the District Court error in awarding lien status to certain "preservation expenses" incurred subsequent to the filing of Ingram-Clevenger's and Tri-County's mechanic's liens and in granting a priority to these expenses superior to that accorded either the mechanic's liens or the Bank's mortgage?

As noted in the facts section of this opinion, following the filing of the mechanic's liens by Tri-County and Ingram-Clevenger, both of these claimants continued to incur expenses relating to the protection and preservation of the Hotel project. These expenses included $10,000 for the installation of a waterline, $3,671.99 for insurance premiums, $5,303.91 for gas and electricity, and $629 for repairs due to freezing. The District Court concluded that these preservation expenses incurred by the claimants should be accorded a first priority of payment over all other liens and incumbrances involving the Hotel project.

Apparently the Bank does not take issue with the District Court's characterization of these expenses as "preservation and protection expenses." Rather, the Bank argues these items should not be accorded lien priority status ahead of the claimants' mechanic's liens or its mortgage. The Bank essentially argues there is no authority in Montana which entitles a mechanic's lien claimant to tack onto its lien, after it is filed, expenditures for the "preservation and protection" of the encumbered property. The Bank argues this does not mean the preservation expenses are not due and the claimants are not entitled to recover these sums from Levee, it simply means these expenses are only a general judgment lien on the Hotel property with a priority behind that of both the mechanic's liens and the Bank's mortgage. We disagree.

- 13 -

We hold there is sufficient statutory authority to allow the claimants to add on to their liens, after they are filed, expenditures for the preservation and protection of the Hotel property. Section 71-3-112, MCA, provides:

> Holder of lien not entitled to compensation. Except as otherwise provided by the Uniform Commercial Code, one who hold property by virtue of a lien thereon is not entitled to compensation from the owner thereof for any trouble or expense which he incurs respecting it, except to the same extent as a borrower under 70-7-110 and 70-7-111.

Of the two statutes mentioned in § 71-3-112, MCA, § 70-7-110 is the statute which is pertinent to the instant case and reads as follows:

> Who to bear expenses. The borrower of a thing for use must bear all its expenses during the loan, except such as are necessarily incurred by him to preserve it from unexpected and unusual injury. For such expenses he is entitled to compensation from the lender, who may, however, exonerate himself by surrendering the thing to the borrower. (Emphasis added.)

Although these statutes do not specifically address the situation of the instant case, they make one obvious point--a lien claimant is entitled to reimbursement from the owner for any expenses necessary to preserve his security from unexpected and unusual injury. Section 71-3-112 is contained under the general provisions regarding lien statutes (Title 71, Chapter 3, Part 1, MCA), therefore its meaning applies to all types of liens involving both real and personal property.

We agree with the claimants that installation of the water line, premiums for fire insurance, the costs of gas and electricity, and repairs due to freezing were necessary to "preserve it [the Hotel property] from unexpected and unusual injury." It is clear that the absence of any of these items would have adversely affected the Hotel property and the improvements made by the claimants. Further, these are expenses that Levee would benefit from if it were to redeem

its interest in the Hotel property at some future date. Therefore, the protection of the claimants' mechanic's liens should extend to these items.

Finally, after finding the preservation expenses may be added to the claimants' mechanic's liens, we agree with the District Court that these items should be accorded a first priority of payment. If a lien priority status is not awarded to these items, a mechanic's lien claimant would be forced with a choice of either permitting damage or destruction to its security, or spending money without hope of reimbursement. Furthermore, as mentioned above, the owner of the property (i.e. Levee) also indirectly benefits from any necessary preservation expenses. Consequently, the District Court's ruling regarding the preservation expenses shall stand.

IV.

Did the District Court err in awarding Ingram-Clevenger an amount ($20,976) in excess of the stated amount of its lien as actually filed with the Clerk and Recorder where no additional or supplemental lien was filed?

Simply stated, the Bank argues that Ingram-Clevenger is not entitled to the amount of a mathematical error discovered during the course of trial. During trial, Petrini (Ingram-Clevenger's secretary/treasurer) testified there was a $20,976 mathematical error in Ingram-Clevenger's filed mechanic's lien and that the lien should be increased by this amount. The District Court ultimately awarded Ingram-Clevenger this math error and tacked it onto the amount of their filed lien. The Bank argues there is no authority in Montana which permits a lien claimant (such as Ingram-Clevenger) to increase (amend) its lien over that which has officially been filed. The Bank goes on further to

- 15 -

argue that Ingram-Clevenger's only remedy would have been to file a new lien, which was not done. Just as with regard to issue 3, the Bank argues this does not mean the mathematical error is not due and Ingram-Clevenger cannot recover this sum from Levee, it simply means the mathematical error is only a general judgment lien on the Hotel property with a priority behind that of both the mechanic's liens and the Bank's mortgage. Once again, we disagree with the Bank.

The Bank correctly points out that under Montana's mechanic's lien statutes, certain procedures must be followed in order to establish a valid lien. Further, these statutory procedures by which a lien is perfected and enforced must be strictly followed or the lien is void. See, Crane and Ordway Co. v. Baatz (1917) 53 Mont. 438, 164 P. 533; Varco-Pruden v. Nelson (1979), 181 Mont. 252, 593 P.2d 48; General Electric Supply Co. etc. v. Bennett (Mont. 1981), 626 P.2d 844, 38 St.Rep. 553. However, this Court has also repeatedly said that this state's mechanic's lien laws are to be "liberally construed":

> [It is a] well-known rule that mechanics' lien laws are remedial, and therefore to be liberally construed and applied . . . It is that, the necessary steps having once been taken to secure the lien, the law is subject to the most liberal construction, for it is remedial in character, and rests upon broad principles of natural equity and commercial necessity.

Crane, 164 P. at 534.

Also, along this same line, this Court recently stated:

> This Court has uniformly held that the requirements of the mechanic's lien statutes as to procedure will be strictly enforced. Once the procedure has been fulfilled, the statutes will be liberally construed so as to give effect to their remedial character. (Citations omitted.)

General Electric, 626 P.2d at 846.

We hold the above principles are applicable to the instant case. Ingram-Clevenger, as the record indicates,

precisely followed Montana's statutory procedure (§ 71-3-511(1), MCA) in perfecting and securing its mechanic's lien--the only problem being it made a good faith mathematical error in the amount of the lien. As the General Electric case indicates, once the procedure to establish a lien has been fulfilled, the statutes will be liberally construed so as to give effect to their remedial character. We hold Ingram-Clevenger should not be prejudiced by its good faith mistake. The company made every effort to comply with the steps necessary to acquire its lien, and equity demands it receive the entire value of its labor and materials put into the Hotel project. Therefore, the District Court was correct in awarding Ingram-Clevenger the amount of its mathematical error.

## V.

Did the District Court err in awarding the mechanic's liens a priority status over that of the Bank's mortgage?

The Bank begins its argument by stating that assuming arguendo the mechanic's liens filed by Ingram-Clevenger and Tri-County are valid and enforceable for their stated amounts (which we have held they are), they are still not entitled to a priority over the Bank's mortgage.

The Bank asserts that § 71-3-502(4), MCA, is the section that controls with regard to the priorities of the instant case. This statute provides:

> Section 71-3-502. Priorities.
>
> . . .
>
> (4) The liens attach to the buildings, structures, or improvements for which they were furnished or the work was done in preference to any prior lien, encumbrance, or mortgage upon the land upon which said buildings, structures, or improvements were erected; and any person enforcing such lien may sell the same under execution, and the purchaser may

- 17 -

remove the property sold within a
reasonable time thereafter. (Emphasis
added.)

The Bank essentially argues that although this statute
specifically says that a mechanic's lien has priority over a
prior recorded mortgage, by the words "mortgage upon the
land" and "were erected" the priorities of this statute apply
only where a mechanic's lien arises out of the construction
of a new structure on previously unimproved land. The Bank
adopts this interpretation from two early cases by this
Court: Interstate Lumber Company v. Rider (1933), 93 Mont.
489, 19 P.2d 644 and Dewey Lumber Company v. McQuirk (1934),
96 Mont. 294, 30 P.2d 475.

With regard to the instant case, the Bank argues that
although its mortgage on the Hotel property was recorded
prior to the claimants' mechanic's liens, their mechanic's
liens do not have priority under § 71-3-502(4) because their
liens arose out of an existing structure on previously
improved land. The Bank asserts that because the claimants
were remodeling and renovating an existing structure (i.e.
the Hotel), the priorities of § 71-3-502(4) do not apply and
the claimants' liens must yield to the Bank's mortgage.

To reach the above result, the Bank admits this Court
must overrule one of its recent decisions. In Home
Interiors, Inc. v. Hendrickson (Mont. 1984), 692 P.2d 1229,
41 St.Rep. 2408, this Court directly interpreted the meaning
of § 71-3-502(4) and stated under the facts of the case that
mechanic's liens are superior to prior recorded mortgages or
trust indentures regardless of the nature of the work done by
the lien claimants. The Court in Home Interiors refused to
strictly interpret the words "upon the land" as the Bank now
suggests, and stated such an interpretation would defeat the

- 18 -

purpose of § 71-3-502(4) which is that a mechanic's lien has priority over a prior recorded mortgage.

The claimants, on the other hand, argue their mechanic's liens have priority over the Bank's mortgage by virtue of a simple statute which the Bank has overlooked. Section 71-3-502(3), MCA, provides:

> 71-3-502. <u>Priorites</u>.
>
> . . .
>
> (3) The liens for work or labor done or material furnished, as specified in this part, shall be prior to and have precedence over any mortgage, encumbrance, or other lien made subsequent to the commencement of work on any contract for the erection of such building, structure, or other improvement.

The claimants point out they contracted with Levee to restore and remodel the Hotel on November 4, 1983, and commenced work on or about the same day. The Bank advanced its loan to Levee on February 6, 1984, and filed its mortgage on February 10, 1984. The claimants note that under the clear wording of subsection (3) of § 71-3-502 their mechanic's liens are superior to the Bank's mortgage. Therefore, the statute and cases relied upon by the Bank are <u>not</u> relevant to the present case. Section 71-3-502(3), MCA, is the only pertinent law which needs to be applied to this case. We agree.

We further find no merit in the Bank's argument that § 71-3-502(3) should be strictly construed to pivot on the phrase "for the erection of such building, structure, or other improvement." Under subsection (3), the priority of a mechanic's lien over a subsequent mortgage is <u>not</u> limited to a situation where a new structure is built (erected) on previously unimproved land. Such an interpretation would defeat the obvious purpose of the statute.

Finally, the claimants argue, and we agree, even if § 71-3-502(3) was not applicable to the present case (which it is), this Court has recently held under the facts in Home Interiors that a mechanic's lien is superior to a prior recorded mortgage. In Home Interiors we stated that mechanic's liens held by material suppliers had priority over a prior recorded trust indenture under § 71-3-502(4) because the holder of the trust indenture was the party with the greatest ability to protect its interest by either withholding funds to the extent of the contemplated improvements or by requiring the landowner to obtain lien waivers. We went on to say this result does not spell imminent disaster for the holder of a prior recorded trust indenture; it merely requires the holder of a trust indenture to exercise ordinary business prudence where construction is contemplated. As we stated:

> We therefore hold the party having the greatest ability to protect its interests has the burden of exercising due care to prevent overreaching by an interested party. In this case respondent [a mortgage corporation] was in the best position to protect against non-payment by the landowner by either withholding funds to the extent of the contemplated improvements or by requiring the landowner to obtain lien waivers from the mechanics.

Home Interiors, 692 P.2d at 1232.

We see no reason to distinguish the Home Interiors case from the instant case. The Bank in the present case had the same opportunity and responsibility as the respondent in Home Interiors if it wanted to protect its mortgage from the lien claimants rights. We hold our decision in Home Interiors is still sound law, and we reject the Bank's analysis of § 71-3-502(4) as set forth above. Therefore, even under this Court's ruling in Home Interiors, the claimants' liens take priority over the Bank's mortgage.

- 20 -

The judgment of the District Court is affirmed.

_John Conway Harrison_
Justices

We concur:

_J. A. Turnage_
Chief Justice

_Frank B. Morrison_

_Fred J. Weber_

_John C. Sheehy_

_L. C. Gulbrandson_

_William E. Hunt_
Justices

- 21 -